Mr. Kellogg, is that right? Yes. Thank you, Your Honor. Give your colleagues a second to sit down there and we'll get started. Very well. Please proceed. Thank you so much. May it please the Court, my name is Mary Kellogg. I'm an attorney in the Office of General Counsel for Los Angeles Unified. We'd like to reserve at least three minutes and we will be watching the clock. Thank you so much. This case presents two questions of statutory interpretation and two questions of misinterpreted legal precedent. The lower courts misconstrued the statutory requirements of IDA's least restrictive environment mandate at 34 CFR Parts 114 to 118, IDA's procedural IEP content requirements at 34 CFR Part 320, subdivisions A.4 about the statement of services, subdivisions A.7 about the frequency and duration, and A.5 about the explanation of time that the student will not participate with non-disabled children. Analytically, the framework of the precedent by this Court and the Supreme Court was misapplied by failing to analyze LAUSD's IEP on its own merits under the Gregory K. v. Longview standard rather than in comparison to the parent's preferred placement and failing to give deference to school officials' reasonable methodological decisions and allowing a more benefit standard, both of which contradict Andrew F. and Raleigh. Counsel, I appreciate your reciting the law. I've handled a number of these cases over the years. Yes, you have. And I'm pretty familiar with it. But I want to ask you a couple of practical questions. You list a range of 1 to 10 sessions for therapy that would actually only total 30 minutes in total. How is a parent supposed to make the school accountable for that large range of sessions? And at the same time, when you answer the question, are you disputing the ALJ's finding that AO needed individualized therapy to receive a THAPE? Let's start with that one. You want to start with the individualized therapy? Are you disputing the ALJ's finding that AO needed individualized therapy to receive a THAPE? Yes, we are, Your Honor, because we were presented throughout hearing, and AO presented this as a didactic choice between typical industry jargon understood terms, an individual session where we take a student out of a classroom, or a group session where we provide the speech with a number of children. LUSD did not choose either, and the IDA does not require LUSD to choose either. Our group collaborative was offered based on the assessed needs of a provider who did the assessment and understood who AO was and offered this service in an IEP. And the ALJ, you cannot escape the ALJ, decided that we didn't offer an appropriate service based on the didactic choice that AO was presenting, which is a flawed application of the requirements of IDA. Sorry, sorry, but I'm having trouble understanding, first, what was even meant by direct collaborative therapy. If I were a parent, I wouldn't know what was meant by that. And the parents presented evidence that this child needed individualized speech therapy. Why couldn't the ALJ credit that? I'm sorry? Why could the ALJ not credit that? The ALJ didn't credit necessarily the individual therapy. Specifically, the ALJ said that our speech therapist, Rubenstein, did not explain how we would deliver the group collaborative services in a group setting. We didn't offer group speech. The direct collaborative services were directly explained by that same therapist, that they would be provided directly to AO with their teacher in the classroom. And that was clear in the IEP as well. If you look at the IEP. And does what you just said answer the question group versus individual? Yes, it does, Your Honor. It was not a group service. The ALJ didn't ask whether or not it was delivered in a group. No one asked if it was delivered in a group. It was not delivered in a group. It would not have been if she had gone. Okay. All right. So your view is a group therapy would satisfy the FAPE requirement here? The FAPE requirement, the IDA's requirement, is that we list the services that we're going to provide. We did. We listed it as group collaborative, and we did explain, and the IEP contextualized how that's done. We gave that explanation in our second brief. But with respect, if I understand it correctly, it was a range of from one to ten sessions, which your total altogether would be like 30 minutes. You can hardly introduce one another in that time period. How does that provide a meaningful FAPE, and why was the ALJ wrong in concluding that it didn't provide a FAPE? The ALJ didn't say that our frequency band didn't provide FAPE. The ALJ said that it wasn't clear to the parents. The parents did not have a perfect understanding of it. That's a different standard. What we provided was clear under the standard of the IDA. We were required to say what the anticipated frequency and duration was. We did that by saying that we would do it frequently, in the case of speech, each week. We did it by saying that we would do the duration, 30 minutes of each week.  The frequency band, had it been removed entirely from the IEP, the IEP would have been appropriate on its face. There wouldn't be any debate. The discretion that LUSD provided the parents was telling them up front, this is a very young child. We don't know how this child is going to respond to these services. We're going to say we might need to break this up. And this is something JTC did as well. Their own speech therapist testified that on any given day, you don't know how a student responds to the service based on mood, based on attention, based on the need for repeated practice. They broke up their services as well. And you believe that the record shows that that discussion with the parents either occurred at that time or was referred to? There was an explanation of the services, but we're required to document the services. And there's no evidence in this record that we wouldn't have discussed any questions with the parent. In fact, there were specific findings that we didn't predetermine in our IEP and that we involved parents in the process. The frequency band just gives us more information on which to go through. There was detailed records about how specific the district keeps its service logs, time in, time out. If, in fact, we were to find that the student was only able to benefit at three minutes of time, we would have had data, we would have known the attention was an issue, and we could have called another IEP. Ms. Kellogg, could I direct you to the substantive disputes here? In particular, this question about whether this child should have been in a classroom with hearing classmates most of the time. First of all, would you agree with me that it seems like the problem here is really quite specific to children with cochlear implants? Yes, I would agree with you, Your Honor. It's specific to children who are choosing the auditory-oral method of learning to listen and speak. Okay. Where, in essence, the more time they spend with other peers who are using language, age-appropriate, et cetera, the better for the child in question, right? That might be the question presented here, but there was no research whatsoever in this hearing that there was an additional benefit to a full-day immersion. The judge didn't find that full-day immersion with typically hearing peers was something the AO required. Instead, the judge found that the district hadn't offered any classroom time with typically hearing peers, and the district court has said that that was an error. There was 90 minutes per week of classroom time that was missing. But we've got a child who basically needs, as I understand this record and the findings by both the ALJ and the district court, we've got a child who basically, to catch up, needs to spend as much time immersed with other kids with normal hearing and speech as possible. And we're having a debate over 90 minutes a week, right? No, we're not having that debate anymore. The hearing officer left it out of their analysis entirely. About the significance of it, and the district judge addressed the problem, right? And even if you count the 90 minutes, I don't know how loud people are supposed to be in talking in library, but we'll leave that aside. But we're still talking about roughly 15%, 17% of the school week immersed with kids with normal speech and hearing, right? We're talking about 15% of academic time where our teacher specifically said she structured language opportunities to do that. But every deaf and educational professional, even JTC, that testified at this hearing, testified that the program the district had put in place, even the 85% of her time, was reasonably designed for AO to make progress. Even their expert witness would not testify that she couldn't receive a benefit in the program the district provided. The district had different opinions about how to go about and achieve that, but there was no research or quantification of the benefit that somehow immersion was a better program, and it was based on testimony about social competence. And that's important because there was no assessed need for social competence. There was no IEP goal for social competence. That's not the intense need that the district was addressing through its IEP goals, placement, services, all of which were deemed to be appropriate by this judge. Ms. Kellogg, let me get, I guess, my most fundamental problem. I've seen a lot of IDEA cases before. I've never seen one brought by a school district challenging an ALJ's findings, let alone an appeal to a court of appeals. From your brief, you seem to be asking us to take, in essence, a third try at weighing conflicting evidence in this case. Why should we do that? Why is this case so compelling and important for the school district to continue to fight this particular child? Your Honor, when this decision was first issued against LUSD, it omitted 90 minutes per week of the mainstreaming opportunities with typical hearing peers that we had provided to AO, and that was the basis of the ruling against us. It omitted the non-academic benefit evidence that we provided to this court. It omitted mention of the 15% written offer in the IEP. There was so little of the district's evidence in this decision that when my client first reviewed it, my client asked, did we put on a case where was our evidence? And this is critical because the analytical framework that this court and the Supreme Court has asked us to apply is the fundamental question that first starts, was the district's program reasonably calculated to provide progress, not in comparison to the private program? And the district court agreed that that had occurred, and in fact cited this court saying, and Judge Smith cited you and Katie Hawaii saying that comparison is appropriate. That would have overturned Gregory K. v. Longview, but you did not overturn Gregory K. v. Longview, Your Honor. What you said in that case was that somehow the parent's program wasn't better. That's a far cry from dismissing the adequacy and judging the district's program on its own merits. That's comparison of a private program in the opposite end. In your view on the question of least restrictive environment, you've bitterly attacked in your brief public versus private schools as the choice here. In your view, does the least restrictive environment evaluation occur based on the overall school environment or based on the experience planned for the particular child in question? So we look to this court's precedent and the IEDA itself. First, the statutory continuum of the IEDA is very clear, and we have to weigh both the non-academic benefit and the academic benefit. Could you answer my question? I'm answering your question, sir, that if we look to D.R. v. Redondo Beach, in that case this court said that a marginal increase in academic benefit does not weigh removal, and regular education environment is important. It's mandated in the IEDA. It's in the LRE regulations, and we had no justification for removing her from that environment. So to decide how restrictive the environment is, do we look at what was planned for her individual experience, the classes she was going to be in, or do we look at the overall school experience for hundreds of other kids? Well, we look at both. We look at the academic benefit, and we look at the non-academic benefit. And look at it this way. If in the D.R. case the marginal academic benefit and being in a more restrictive setting is what the district was arguing for, if somehow the district had said, hey, we're going to take some non-disabled peers and put them in a special day class, would that have justified the student's removal to a special day class? That's what happened here. We had a small number of peers on a completely separate campus, totally removing. If JTC was the offer, the removal from the regular education environment percentage in the IEP would have been 100%, not 85%. We do think it matters. We do think it's important. And the testimony we provided about the non-academic benefits that this student received, nobody disagreed that she was socially able to receive benefit from recess. And our testimony and evidence was that there was an active benefit to her integrating into that community and learning to assimilate to a larger campus and being ready for mainstreaming. But that didn't appear in the decision. It wasn't there. I will reserve my time. We've used up your time. We may give you a little bit of time for rebuttal. Let's see how we do with the other side here. Thank you. Thank you, Your Honor. Very well. Mr. Gray. Thank you. Good morning. And may it please the Court, I would like to reserve two minutes on our cross-appeal regarding the narrow issue regarding individual speech. This case revolves around an administrative law judge that heard six days' worth of evidence, carefully weighed the evidence, considered a totality of what was said, and made some very specific findings on the record. This judge made a specific finding that this child needed individual speech for language development to comply with FAPE. This administrative law judge made a factual finding that the 1 to 10, 30-minute speech interval was confusing. He didn't specify how much was going to be. Couldn't that have been clarified by just a simple question? Well, what does this mean? Can you explain? I mean, part of the process. Well, that never happened because nobody told the parents at the meeting that there was going to be a 1 to 10-minute interval. When the speech-language pathologist spoke up about the speech pathology service at the IEP meeting, she said, I'm recommending 30 minutes of speech and went on to other topics. Any parent sitting at an IEP meeting hears the speech pathologist say, we're going to give you 30 minutes of speech. Common understanding is we're getting 30 minutes of speech. There was nothing said at the meeting about this 1 to 10-minute interval. To kind of follow up, when the parents expressed their confusion when they signed the IEP, nobody from the district said, hey, let's sit down, let's talk. They told the family, if you disagree with us, go file for due process. So there was no effort by Los Angeles to clarify anything. To the contrary, the administrator at LAUSD said, if you disagree, go file for due process. Counsel, let me ask you this. It seems to me the ALJ seems to have thought that the only way AO could have mainstreaming was at Santa Coy during recess and holiday parties. If I got that correct, was he wrong? No, the only mainstreaming or exposure to non-disabled peers at Santa Coy would be the recess yard, which was not acoustically appropriate for this child to be able to hear, occasional holiday party, and then there was some conflicting testimony among the folks at LAUSD. One witness said there would be exposure to general education peers during, I think, library art and music. Several other LAUSD teachers, including a prior teacher of that class, never mentioned these other opportunities. But to give Los Angeles the absolute best-case scenario, the absolute best-case scenario would be that this child would have exposure to general education peers for the 30 minutes on the recess yard for an occasional holiday party, music, library, and art, and that would amount to only 15% of this child's school day, according to the IEP that Los Angeles wrote. That's just plainly inadequate to address this child's needs as a deaf and hard-of-hearing child who needs to learn language by listening, by exposure to what other people are saying. For a child like AO, it's no different. We all learn language by listening, by hearing. We all speak what we hear. That's why we have regional accents. That's why we have different languages, because you do what those around you do. That's why AO so desperately needed to have maximum time with non-disabled, good-language role models. Counsel, was the ALJ made aware of these counterarguments, if you will, that you've just given to us? Yes, they were in the record. This was evidence in the record, a considerable amount of which was provided by witnesses from Los Angeles, some of Los Angeles' own school teachers. In addition, and I think this is a pivotal point in the case, the student, AO, had two witnesses who were extremely experienced in what was necessary to teach children with cochlear implants how to listen and speak. They testified that the most important thing is to have language models, good peer role models. Again, we speak what we hear. And that AO needed that exposure to be able to fill the gap. And these witnesses went on and said something else that's really important, that you need to do it with age-appropriate peers because the language that you're going to get from an adult classroom teacher is going to be different than the language you're going to get from your 3-year-old preschool peer on the schoolyard. And one of the witnesses used the phrase as social competence, social competence meaning how do we converse with our peers? How do we use the same vocabulary? How do we talk about the same subjects? And so when we hear that phrase social competence come up, it's got nothing to do with whether this kid had social or emotional difficulties. This kid was a typical, average, normal girl in every respect except for the language difficulties she had because of her hearing loss. There was no reason in the world why this little girl could not be with general education kids. And, indeed, it was necessary for her to be with general education kids so she could develop language to an appropriate level of proficiency, which is the standard in the state of California for children who are deaf. She needed it to be able to master her language, which, again, is the specific requirement in the state of California for children who are deaf and hard of hearing. Mr. Gray, on this music art library 90-minutes-a-week question that has been such a focus in the briefing, could you help us understand how that came to be an issue? Was it hotly contested in the ALJ and the ALJ just got it wrong? Or what accounts for the controversy we see here? It was a footnote until the school district raised it in the district court to say, well, the administrative law judge messed up. Literally a footnote before the ALJ? I'm taking license with my language. I don't know if we've got that briefing in our records. That's been fully briefed. The factual predicate for the judge to make that decision was adequately fleshed out in the due process hearing. There was literally one witness who talked about that. And then, in any event, the district judge sorted it out, correct? Not only did she sort it out, she weighed everybody's evidence and correctly concluded that this child needed to be with general education students both for her language development needs and, separate and apart from that, for the least restrictive environment. On the least restrictive environment, let me ask you the same question I asked your colleague on the other side about whether we should evaluate whether a child is being put in the least restrictive environment based on the larger school or based on the planned experience for that child? It's got to be the planned experience for the child because that's the only thing that fits with the express statutory text of IDEA. The express statutory text of IDEA says that least restrictive environment is to the maximum extent appropriate the child with a disability is educated with non-disabled children. And so the statutory text focuses on who are going to be the child's peers in the classroom. The statutory text does not talk, does not define least restrictive environment in terms of being on a public school campus or being in an environment with anything other than non-disabled kids. And, in fact, the argument that Los Angeles is making regarding least restrictive environment kind of prioritizes housing children with disabilities on a public school campus above the need to physically be with non-disabled peers. That makes no sense, and that's contrary. You've made that point in your brief. Could I ask you a practical question to follow up on Judge Collins' question earlier about these frequency bands that also have been so controversial here? Frankly, it seems to me that there would have to be at least some play in the joints in a plan, right? A plan, if it just says, okay, one session, 30 minutes a week, what do you do when somebody has an off day, a sick day, the teacher's sick, whatever, you're going to need some flexibility, right? One to ten seems like an awful lot of flexibility. How much flexibility does the school district need, and is it entitled to under the statute and regs? Okay, the school district has flexibility. The Ninth Circuit, in the case of Van Duyne, which is cited in the papers, says that before there's a violation, it has to be a material deviation from what's specified in the IEP. So if it's an occasional lapse, if on occasion the child is not up to the full service, that's not a material deviation from the IEP. That's the play in the joints that you're looking for. If the district were overly concerned, and in this case it could not be, there's no evidence in the record, there's nothing in this child's IEP. If you look at the IEP where it talks about the child's areas of needs, there's nothing in the IEP about this child having an attention problem or not being able to attend to a full 30-minute session of services. So as a practical matter, not an issue for this child. As a practical matter, giving the school district the benefit of the doubt, the law already has them covered because it has to be a material deviation. And I'll take it one step further. I would be tremendously worried if the child is having anything more than an occasional ability to follow a 30-minute service. And why aren't they getting data on that and holding another IEP to evaluate what's going on here? We thought this kid could do it. She's not doing it. What do we need to do to rectify that? That would allow a deficit to go unremediated. It would be, again, anything other than the occasional lapse, and occasional lapse is not going to be a problem. I guess the bottom line from my perspective is you've got unequivocal testimony, you've got unequivocal findings from the administrative law judge about what this child needs, and nobody, not even the folks from Los Angeles Unified School District, said that this kid would benefit from three minutes or four minutes or five minutes of speech. So my question is why write an IEP that on its face doesn't meet the child's needs? That's a defect in the process because it does not allow... We briefed some issues in terms of accountability. It takes away accountability. It takes away the IEP as a mechanism, as a blueprint for enforcement. It also undermines the parents. Again, the statutory text says that the parent has to be provided with enough information so they can give informed consent. The statutory language says informed consent. Well, informed consent means the parent knows what they're consenting to, and this IEP just doesn't do that with this cryptic language. My final comment before I take my reserved time is I have to question. I've had more clients than I can remember look at this LAUSD IEP with an interval range and not know, is it 300 minutes? How many minutes am I getting? It's not apparent to somebody just reading the document. And with that, unless there are more questions... Okay, I'm going to reserve the balance of your time for your cross. Thank you. We'll give you a couple of minutes. Thank you, Your Honor. So first of all, the district court credited the ALJ's analysis as thorough and careful on the finding of the word occasional, which was only in reference to holiday celebrations and did not ever at any point include 90 minutes a week. And the person that testified to that was the person who was responsible for implementing that 15% offer that we committed to in the IEP. There was testimony, of course, by JTC witnesses that somehow this 90 minutes they didn't think was appropriate. They thought that they needed full-day immersion. The judge did not rule that full-day immersion was accredited. There was testimony that DHH peers were appropriate role models. There was testimony that DHH teachers were appropriate role models, as well as DHH experts. And there was also testimony by LAUSD that there were concerns about having typically hearing peers there. The assessor, the psychologist, said, typically hearing peers can blurt out and overwhelm AO. This is someone who observed AO's demeanor. Another member of the IEP team, Ms. Lutz, observed not only providing services but in a classroom-like setting before the IEP and observed AO being distracted by noise. And our own teacher testified that they wanted to focus intensely on the language needs and that, yes, typical hearing peers are appropriate role models and important to the development, which is why we offered some of them. But she said, not always. It's best during these play activities where we can foster this practice of the language and skills that we're learning in the classroom. And regarding the LRE standard, the IDA does not define reverse mainstreaming. It's a novel, unicorn program that only exists in LAUSD's backyard. There's concern put by CSBA that anyone would be able to implement this. Sorry, by whom? The Amicus CSBA briefing. You're over your time, so let me ask my colleagues whether either has additional questions for the district. I know you have a lot more to say, but we're going to follow our rules here. May I wrap up with one final point? No, with respect. Otherwise, everybody can do that. We have your brief, and we appreciate it. Okay. Thank you very much. Thank you. You have your cross. You have two minutes. Your Honor, unfortunately, I didn't hear anything regarding the individual speech issue, which is the issue I reserved on. So unless the panel has any questions for me, I think I'm out of luck. Other questions? I think not. Thanks to both counsel for your argument. The case just argued is submitted. Thank you. And the court stands adjourned for the day. All rise. This court for this session stands adjourned.
judges: SMITH, Hamilton, COLLINS